**ENERGY RESERVES GROUP, INC., and Suburban Propane Gas Corporation, Appellees,**

**Marathon Oil Company and Sklar & Phillips Oil Company, Intervenors-Appellees,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Appellants.**

**SIERRA PETROLEUM CO., INC., Appellee,**

**Maurice L. Brown Company, Intervenor-Appellee,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Appellants.**

**BRADEN–ZENITH, INC., Appellee,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Appellants.**

**Nos. 10–15 to 10–17.**

Temporary Emergency Court of Appeals.

Argued May 8, 1978.

Decided Oct. 31, 1978.

Christensen, J., filed a concurring opinion.

Zirpoli, J., filed a dissenting opinion.

Robert G. Heiss, Nancy C. Crisman, Haywood Torrence, Jr., and Mark J. Kreitman, Dept. of Energy, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Dennis G. Linder, David Epstein, and Bruce G. Forrest, Dept. of Justice, Washington, D. C., were on brief, for appellants.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., with whom Robert I. Guenthner, Wichita, Kan., was on brief, for appellees.

Daniel Joseph, Akin, Gump, Hauer & Feld, Washington, D. C., with whom Warren E. Connelly, Washington, D. C., and Thomas Brown, Brown & Fox, Kansas City, Mo., and John R. Cope and Arthur M. Mey-er, Jr., Bracewell & Patterson, Washington, D. C., were on brief, for appellees.

Warren Belmar, Keith A. Jones and Amanda Birrell, Fulbright & Jaworski, Washington, D. C., were on brief, for amici curiae, Kansas Independent Oil & Gas Association and National Stripper Well Association.

Before CHRISTENSEN, BECKER and ZIRPOLI, Judges.

BECKER, Judge:

### Introduction

In these cases the appellees question the validity of Ruling 1974–29 of the Federal Energy Administration (FEA), designated as an "interpretative" rule by FEA. If Ruling 1974–29 was interpretative, the ruling was exempt from the rule making requirements of § 553(b) and (c) Title 5 U.S.C., a part of the Administrative Procedure Act (APA). Section 553(b) of the APA permits all administrative agencies to issue interpretative rules without prior notice and opportunity for submission of written views, data and argument. The district court held that Ruling 1974–29 was not interpretative, but was legislative,[1] and therefore invalid under § 553(b) and (c) of the APA, requiring notice and opportunity to comment prior to its adoption.

Appellants, Department of Energy (DOE) and the Secretary of Energy,[2] contend that Ruling 1974–29 was properly designated as interpretative of a regulation, 10 C.F.R. § 210.32(b), and of the underlying statutory provisions exempting crude petroleum produced by "stripper wells" from allocation and price regulation.

### Statement of the Issue

Appellants, DOE and the Secretary of Energy, properly state that the issue[3] in these consolidated appeals is as follows:

---

1. The district court used the term "substantive" but all parties agree that "legislative" was intended.

2. FEA and the Administrator of FEA have been succeeded by the Department of Energy (DOE) and the Secretary of Energy as appellants.

3. In an effort to sustain the decision of the district court, on grounds not relied on by the district court, appellees have undertaken to expand the issues as noted hereinafter.

Whether the District Court erred in holding that Federal Energy Administration ("FEA") Ruling 1974–29 (39 F.R. 44414, December 24, 1974), which interpreted the stripper well exemption as excluding injection wells from the "well count" for purposes of applying the exemption, is null and void and without effect because it was published without utilizing the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b). [Footnote omitted.]

### Section 553(b) of the APA

The applicable portion of § 553(b) of the APA is as follows:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, *this subsection does not apply* —

(A) to *interpretative rules*, general statements of policy, or rules of agency organization, procedure, or practice. [Emphasis added.]

Appellees contend generally that Ruling 1974–29 was by its nature and effect a "legislative" rule subject to the notice and comment requirements of § 553(b) and (c), and that therefore the designation of the ruling by FEA as interpretative is legally ineffective. Appellees also contend that the administrative action of issuing the ruling was subject to the stricter requirements of § 7(i) of the Federal Energy Administration Act (FEAA), which was § 766(i) Title 15 U.S.C. (repealed P.L. 95–91).

### General Importance of Decision

The determination of the issue presented by these opposing contentions, in favor of appellees would have potentially drastic adverse·effects on the past, present and future administration of the emergency energy price and allocation programs, by casting serious doubt on the validity of all the rulings designated as interpretative rules by the successive agencies administering the emergency energy programs. But transcending the doubt cast on the validity of rulings of the successive agencies administering the emergency energy programs, is the potentially disastrous effect such a precedent would have on all rulings designated as interpretative, under § 553(b) of the APA by the numerous federal administrative agencies. The effects of a questionable construction of § 553(b) of the APA in these appeals cannot be isolated and applied only to the rulings of FEA and DOE because § 553(b) of the APA applies generally to all federal administrative agencies.

The possibility of these effects can be ascertained by an examination of the *reasons presented by appellees* to support their contention on the primary issue that, despite the designation of Ruling 1974–29 as interpretative by FEA, the Court should conclude that the ruling was legislative, and not exempt from the requirements of § 553(b) and(c) of the APA. These reasons are as follows:

1. P.L. 93–153, the now repealed § 406(a) of the Trans-Alaska Pipeline Authorization Act (TAPAA) and § 4(e)(2)(A) of the Emergency Petroleum Allocation Act of 1973 (EPAA) provided a statutory exemption from price and allocation regulation of the first sale of crude oil produced in the United States from any lease "whose average daily production of crude oil

for the preceding calendar year does not exceed ten barrels per well." (This is not controverted.)

2. In § 406(c) of TAPAA and § 4(a) of EPAA Congress delegated authority to the Cost of Living Counsel (COLC) to promulgate regulations implementing the exemption of such wells. COLC was succeeded by FEA in the performance of this function. (This is not controverted.)

3. COLC (and later FEA) promulgated regulations defining the formula in computing average daily production that did not define the term "well", used in the statute, to exclude injection wells except possibly by implication. (It is necessarily conceded by appellees that the two regulations defining average daily production expressly provided that only wells "which produce crude petroleum" could be counted in the calculation of average daily production. 6 C.F.R. § 150.54(s); 10 C.F.R. § 210.32(b).)

4. In 1974, to expressly exclude injection wells from the calculation of average daily production, FEA issued Ruling 1974–29, designated by FEA as an interpretative ruling, without complying with either the notice or comment procedures of the APA.

5. The designation of Ruling 1974–29 as interpretative by FEA was not persuasive or legally binding on the courts.

6. Whether Ruling 1974–29 was legislative, rather than interpretative, should be determined by applying a test of whether the ruling had a "substantial impact" on the regulated parties. Among other authorities on which appellees rely as supporting this proposition are *National Helium Corporation v. FEA* (Em.App.1977) 569 F.2d 1137, and *Shell Oil Company v. FEA* (Em.App.1978) 574 F.2d 512.

7. The contention of appellants that Ruling 1974–29 was interpretative is rebutted by the fact that the original definitions of the elements of the stripper well exemption were in the regulations 6 C.F.R. § 150.54(s) and 10 C.F.R. § 210.32(b), which were legislative in nature.

8. Ruling 1974–29 had a "substantial impact" on the regulated parties because it was the first effective notice to appellees that injection wells were excluded in computing average daily production, particularly since the Department of Interior had counted injection wells for purposes of qualifying for a reduced royalty. 30 C.F.R. § 221.49(b). "Substantial impact" in the contention of appellees, ranges from subjective disappointment in the interpretation contrary to the hopes, desires and beliefs of appellees, to interpretation of the statute, regulation or both having a future effect in a manner that is not reasonably anticipated by the affected parties, including the public, from the statutes in question.

9. Section 7(i) of the FEAA required the FEA to "resolve doubts about application of procedural safeguards in favor of their full application."

10. Ruling 1974–29 is void because of the failure of FEA to comply with the notice and comment procedures of § 553(b) of APA and § 7(i) of FEAA.

It is concluded that this intricate sophisticated reasoning of appellees is contrary to the decisions of the Supreme Court of the United States and the weight of applicable authorities in 1974 and thereafter, *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); and that, for the reasons hereinafter stated, the result of acceptance of the contentions of the appellees would create a doctrine in administrative law that would seriously and adversely affect the accepted, and hitherto legal, practices of all federal administrative agencies including FEA and DOE in issuing interpretative rules without opportunity for notice and comment.

## The Text of Ruling 1974–29

Ruling 1974–29, in question in these cases, was issued by FEA on December 24, 1974, as an interpretation of 10 C.F.R. § 210.32(b), the later of two consistent regulations defining "average daily production" of a property for the purposes of determining if the property qualified as a stripper well. (39 Fed.Reg. 44414.) It is as follows:

*Facts.* Firm P, a producer of petroleum, produced during the preceding calendar year 150,000 barrels of crude petroleum and petroleum condensates, including natural gas liquids from 40 production wells located on Property A, as defined in 10 CFR 210.32. In addition, there were five injection wells in operation on that property last year. An injection well is one which is used to inject water, air, gas, steam or other materials into the ground to assist in the recovery of crude petroleum through producing wells. Wells which formerly produced crude petroleum may be used for injection purposes, or new wells may be drilled solely for the purpose of injecting materials into oil-bearing formations and reservoirs.

The average daily production per well from Property A was 10.27 barrels, based on the 40 production wells, whereas the average daily production per well would be 9.13 barrels if 45 wells, including the 5 injection wells, were used to calculate the average daily production figure.

*Issue.* Is an "injection" well a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 CFR 210.32?

*Ruling.* No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease, is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calendar year. "Average daily production" is further defined in 10 CFR 210.32(b) as:

The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of days in that year times the number of wells which produce crude petroleum and petroleum condensates, including natural gas liquids, from that property in that year.

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result.

## History of the Stripper Well Exemption

What has become known as the "stripper well" exemption appeared in § 4(e)(2)(A) of the Emergency Petroleum Allocation Act of 1973 (EPAA), P.L. 93–159, § 751 *et seq.* Title 15 U.S.C., reading as follows:

The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

The "stripper well" exemption was also contained in substantially the same language in § 406(a) of the earlier Trans-Alaska Pipeline Authorization Act (TAPAA), P.L. 93–153, § 1651 *et seq.* Title 43 U.S.C. In December 1975, the exemption was re-

pealed by the Energy Policy and Conservation Act (EPCA), P.L. 94–163, § 6201 *et seq.* Title 42 U.S.C., and § 753 *et seq.* Title 15 U.S.C.

In 1976 the "stripper well" exemption was reinstated by § 121 of the Energy Conservation and Production Act (ECPA), P.L. 94–385 which amended the EPAA by adding § 757(i) Title 15 U.S.C.

The price control regulations of FEA continuously excepted from maximum ceiling prices crude oil produced from stripper wells, except for the period from February 1, 1976, to August 31, 1976.

The history of the "stripper well" exemption has been carefully and accurately summarized by this Court in *Southern Union Production Company v. FEA* (Em.App.1978) 569 F.2d 1147, l.c. 1149, 1150, as follows:

As enacted on November 23, 1973, the EPAA exempted from price controls the first sale of crude oil from leases whose daily average production did not exceed 10 barrels per well. On December 24, 1974, the FEA issued Ruling 1974–28, 39 Fed.Reg. 44414 (1974), confirming its determination that gas well condensate was ineligible for the stripper well exemption. This regulation is specifically challenged by appellants.

Section 401 of the Energy Policy and Conservation Act of 1975, enacted on December 22, 1975, repealed the stripper well exemption of the EPAA. It is clear from the Conference Report, however, that Congress contemplated that stripper well production would be placed in the upper tier of the two-tier pricing program then in effect. The FEA amended its regulation to place stripper well crude oil under the upper tier, 10 C.F.R. § 212.-71 *et seq.* . . .

Section 121 of the Energy Conservation and Production Act of 1976, enacted on August 14, 1976, reinstated the stripper well exemption by amending the EPAA. 15 U.S.C. § 757(i) (Supp.1977). The FEA then implemented the exemption of "stripper well crude oil", but continued to deny its application to condensate produced from gas wells. 10 C.F.R. 212.54, 41 Fed.Reg. 48319, 48323 (1976).

Since the enactment of the EPAA in November, 1973, the FEA has consistently defined crude oil to include gas well condensate for jurisdictional purposes under section 4(a) of the Act, but has excluded gas well condensate from the stripper well exemption. Yet, when Congress reinstated the stripper well exemption in August, 1976, by adding section 8(i) to the EPAA, there was no attempt to change the FEA's interpretation. Rather Congress added as subsection 8(i)(4) the provision that, "The President may define terms used in this subsection consistent with the purposes thereof." [Footnotes omitted.]

### The Successive Stripper Well Regulations and Rulings

In obedience to the statutory mandates the "stripper well" exemptions have been defined and clarified in the following successive regulations and rulings: 6 C.F.R. § 150.54(s); 10 C.F.R. § 210.32(b); Ruling 1974–28 approved in the *Southern Union Production Company* case, *supra*; and in Ruling 1974–29 under attack in this case.

Except for a typographical error occurring in 1974, which was quickly corrected, the regulations of FEA have consistently described (and interpreted) the phrase "average daily production" in regard to crude petroleum, to be the average daily production computed by dividing: "The qualified maximum total production of domestic crude petroleum . . . from a property during the preceding calendar year, divided by . . . the number of wells which produce crude petroleum . . . from that property in that year." 10 C.F.R. § 210.32(b); 6 C.F.R. § 150.54(s). (This quotation omits references to natural gas condensates or liquids.)

### Material Part of Ruling 1974–29

In December 1974, FEA issued Ruling 1974–29, the ruling in question in these cases quoted in full above, to interpret the regulation 10 C.F.R. § 210.32(b), and the underlying statutes. The material part of Ruling 1974–29 reads as follows:

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves, "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result.

It is this part of Ruling 1974–29 that the district court held to be null and void because it was "substantive" [legislative] rather than "interpretative" in nature, and because FEA did not follow the notice and comment rule making requirements of § 553(b) Title 5 U.S.C. In this connection the district court concluded that the rule was not exempted from the notice and comment rule making requirements by subparagraph (A) of § 553(b) Title 5 U.S.C.

*Legislative History of the Stripper Well Exemption*

The legislative history of § 4(e)(2)(A) of EPAA in the Joint Explanatory Statement of the Committee of Conference (Conference Report 93–628), 2 *U. S. Code Congressional and Administrative News, 93rd Congress, First Session 1973* 2688, l.c. 2694, 2695 is as follows:

Section 4(e) of the House amendment also stated that no regulation under this section was to provide for allocation of, or specify (or prescribe a manner for determining) the price of, crude oil produced in a calendar month by any well, the average daily production of which did not exceed 10 barrels per day during the month preceding such calendar month.

\*    \*    \*    \*    \*    \*

*General.* The conference substitute basically follows the House amendment to the Senate bill. It provides for the man-

datory allocation of crude oil, residual fuel oil, and each refined petroleum product produced in or imported into the United States.

Section 406 of TAPAA, enacted earlier in 1973, provided the stripper well exemption in paragraph (a) and contained two related paragraphs (b) and (c). Section 406 of TAPAA reads as follows:

(a) The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970, as amended, or to any allocation program for fuels or petroleum established pursuant to that Act or to any Federal law for the allocation of fuels or petroleum.

(b) To qualify for the exemption under this section, a lease must be operating at the maximum feasible rate of production and in accord with recognized conservation practices.

(c) The agency designated by the President or by law to implement any such fuels or petroleum allocation program is authorized to conduct inspections to insure compliance with this section and shall promulgate and cause to be published regulations implementing the provisions of this section.

The legislative history of § 406 of TAPAA in the Joint Statement of the Committee of Conference (Conference Report No. 93–624), 2 *U. S. Code Congressional and Administrative News, 93rd Congress, First Session 1973* 2523, l.c. 2531–2532 reads as follows:

Section 406, relating to stripper oil wells, was a Senate floor amendment to S.1081. The Conferees have adopted the general concept of the floor amendment, but have added new provisions to insure that the exemption is narrowly defined and prudently administered, and to insure that the incentive being granted is properly limited in accord with congressional intent.

The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act (now in Phase IV) and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons.

As of January 1, 1973, there were 350,000 stripper wells producing ten barrels a day or less. Stripper wells account for 71 percent of all of the oil wells in this country, but produce an average of only 3.6 barrels per day, or only 13 percent of total U. S. domestic crude production. Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production, they are shut in, and a known and developed crude oil reserve is lost to U. S. production. Removing Phase IV price restraints from these marginal stripper wells has the effect of increasing the value of the crude oil they produce by about $1.30 per barrel (the difference between $4.02, the current per-barrel ceiling average under Phase IV, and $5.32, the per-barrel average price for "new" domestic crude oil production which is not subject to Phase IV). This price incentive will encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market.

The words "first sale" in Section 406(a) refer to the initial sale from the producer to a refiner, oil broker or other party. Thereafter, the exemption expires and any applicable provision of the Economic Stabilization Act or any mandatory allocation program may apply.

The exemption also runs only to "crude oil and natural gas liquids." It does not run to natural gas produced by these wells. Natural gas production and pricing continue to be regulated by the Federal or State agency having jurisdiction over the particular wells involved.

*The Congress intends that the provisions of this section will be strictly enforced and regulated by the administering agency to insure that the limited exemption of this class of wells for the express purposes described above is not in any way broadened.* To achieve this, Congress authorizes on-site inspections to insure compliance. Congress also directs that the administering agency shall promulgate regulations to implement the provisions of this section before it becomes operative. The Conferees expect the administering agency to utilize State data regarding production volumes, and to provide by regulation safeguards against the manipulation of gerrymandering of lease units in a manner that evades the price control and allocation programs. [Emphasis added.]

These regulations shall be so designed as to provide safeguards against any abuse, over-reaching or altering of normal patterns of operations to achieve a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. The *sole* purpose and objective of this Section 406 is to keep stripper wells—those producing less than ten barrels per day—in production and to insure that the crude oil they produce continues to be available for U. S. refineries and U. S. consumers. It is not intended to confer any benefit on the owners and operators of wells producing in excess of ten barrels per day. The Congress also intends that the regulations provide appropriate limitations

and provisions in the definition of "lease" to insure that an administratively workable system is established which does not permit abuse.

### Regulations Defining Average Daily Production of Wells Under EPAA and TAPAA

COLC performed its mandatory obligations under EPAA and TAPAA to promulgate regulations in respect to stripper wells by issuing first 6 C.F.R. § 150.54 containing paragraph (s) reading as follows:

(s) *Stripper Wells*—(1) *Rule.* Effective November 27, 1973, the price charged for the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease is exempt.

(2) *Definitions.* As used in this paragraph—"Average daily production" means the qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of calendar days in that year times the number of *wells which produced crude petroleum* and petroleum condensates including natural gas liquids from that property in that year. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production. [Emphasis added.]

"Domestic crude petroleum" means crude petroleum produced in any of the several States, or the District of Columbia or from the "outer continental shelf" as defined in 43 U.S.C. 1331.

"First sale" means the first transfer for value by the producer or royalty owner. "Property" is the right which arises from a lease in existence in 1972 or from a fee interest to produce domestic crude petroleum in existence in 1972 and is coextensive with that property used in paragraph (b) of this section for purposes of determining "base production control level." "Stripper well lease" means a "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the peceding [sic] calendar year.

The above quoted provisions of 6 C.F.R. § 150.54(s) were later superseded by 10 C.F.R. § 210.32 in which FEA further refined the hurriedly drafted regulation, effective November 27, 1973, incorporating the essence of § 406 of TAPAA and § 4(e)(2)(A) of EPAA. Paragraph (b) of 10 C.F.R. § 210.32, once amended in other respects, consistently defined the term "average daily production," in issue in these cases, as it was defined in 6 C.F.R. § 150.-54(s) in the following language:

(b) Definitions: "Average daily production" means the qualified maximum total production of crude oil, including condensates, produced from a property, divided by a number equal to the number of days in the year times the number of *wells that produced crude oil, including condensates,* from that property in that year. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production. [Emphasis added.]

### I

### Ruling 1974–29 Is Clearly Interpretative and Exempted From the Requirements of § 553(b) of the APA

While the applicable statutory and regulatory provisions were in force, in the substance and form set out above, the ingenious notion was advanced that Congress, in enacting the EPAA and TAPAA, intended to include "injection wells," employed to enhance recovery of crude petroleum and condensates, as "wells" in the statutory computation of "average daily production."

As stated above, FEA had previously dealt with this question by carefully setting forth in the mandatory regulations that only "wells which produced crude petroleum and petroleum condensates" were a factor in the formula for determining "average daily production." FEA consistently disallowed the count of injection wells in the formula. Despite the apparently clear statutory and regulatory provisions, FEA, confronted with claims such as those advanced in these cases, determined to put firmly at rest its official position concerning its interpretation of the term "average daily production" as used in the regulations (and statutes) by issuing in December 1974, its Ruling 1974–29, quoted above, interpreting the statutory stripper well exemption defined in the existing mandatory legislative regulation 10 C.F.R. § 210.32.

It is submitted that Ruling 1974–29 is interpretative because (1) FEA deemed it to be interpretative; (2) in its nature and effect the ruling was in fact and law an interpretation of the mandatory stripper well exemptions provided by EPAA and earlier by TAPAA, and defined by 10 C.F.R. § 210.32; (3) the ruling has no "impact," if its impact is a consideration in determining its nature. These reasons will be developed in detail hereinafter.

■ (1) Ruling 1974–29 was deemed by FEA to be interpretative. While this characterization by FEA is not controlling, its interpretation of its statutory mandate is entitled to judicial deference, under persuasive authorities and the prior rulings of this Court. *Southern Union Production Company v. FEA, supra,* 569 F.2d 1147, l.c. 1152 upholding a similar ruling interpreting the statutory stripper well exemption and the stripper well regulation; *Marathon Oil Co. v. FEA* (Em.App.1976) 547 F.2d 1140, *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977).

(2) By its nature and effect, Ruling 1974–29 was an interpretation of the stripper well exemption provided by EPAA and TAPAA, and defined in 10 C.F.R. § 210.32. An examination of the statute and Ruling 1974–29 makes this evident. The ruling does not purport to expand or constrict the meaning of the term "average daily production" as used in EPAA, TAPAA, and 10 C.F.R. § 210.32. It is in its nature a clarifying interpretation of the underlying statutes EPAA and TAPAA, and of the mandatory regulation 10 C.F.R. § 210.32, caused by the ingenious attempt to include injection wells in the statutory and regulatory formula. Further, Ruling 1974–29 was not only a reasonable construction (interpretation) of the statute and the regulation (the validity of which was accepted by the district court), but in addition may be the construction ultimately preferred by the courts.

It is submitted that what FEA did in issuing the ruling was exactly in nature what a court would do if, without Ruling 1974–29, the question were presented to a court in a judicial proceeding to review administrative action of the FEA in disallowing the claim of a producer.

If a court in an actual controversy, in interpreting the statutory exemption, can exclude injection wells from the formula, how does the nature of the process of judicial interpretation differ from the action of FEA in issuing Ruling 1974–29? The answer is that it does not differ.

■ The judicial process of interpretation does not become legislative in nature when an administrative agency engages in the same process and reasoning for the same purpose.

If an administrative rule in form and substance is interpretative it is within the exemption of § 553(b) of the APA. For the administrative law on the subject, attention is invited to 1 K. Davis, *Administrative Law Treatise* § 5.03, l.c. 304, discussing what interpretative rules may interpret as follows:

Interpretative rules may interpret (1) a statute, (2) a legislative rule, (3) another interpretative rule, (4) judicial decisions, (5) administrative decisions, (6) administrative rulings, (7) any other law or interpretation, (8) any combination of items on this list, or (9) nothing.

Ruling 1974–29, under examination in these cases, expressly and permissibly interpreted another valid legislative rule, namely, the regulation 10 C.F.R. § 210.32(b). It also interpreted the underlying statutory language "average daily production," used in defining the stripper well exemption of EPAA and TAPAA, and repeated in 10 C.F.R. § 210.32(b). So Ruling 1974–29 satisfies the initial requirements of an interpretative rule that it interpret a statute or another rule or both. The contention that Ruling 1974–29 is legislative because it interprets a legislative regulation is unsound.

In regard to the stripper well exemption in Ruling 1974–29, the FEA did not undertake to expand or constrict the exemption. In fact, it had been commanded by TAPAA in § 406(c) to administer the statutory exemption as provided by law strictly to prevent misuse thereof. The argument that § 406(c) of TAPAA commanding strict control of the exemption somehow makes this interpretative rule a legislative rule is not logical.

The following language from K. Davis, *Administrative Law of the Seventies* § 5.03–1, l.c. 152, aptly describes the nature of the process by which FEA issued Ruling 1974–29 as an interpretative ruling:

> But why, then, may an agency issue interpretative rules without a legislative grant of power[4] to do so? The theory is quite clear: When Congress enacts a statute and assigns the administration of it to an agency, the agency encounters questions the statute does not answer and the agency must answer them. The agency heads must instruct their staffs what to do about such questions, and the instructions are interpretative rules. But they are not binding on the courts. The courts may find them persuasive and may treat them as if they were binding, but the courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation. The preliminary power of interpretation is in

the agency, but the final power of interpretation is in the courts.

The above quotation defines the preliminary feature of an interpretative ruling, and the final power of the courts to substitute its own interpretation. In the case of a legislative rule or regulation, the courts usually refrain from substituting their judgment on the subject matter of the legislative rule or regulation. This is stated in the following language in 1958 from 1 K. Davis, *Administrative Law Treatise* § 5.03, l.c. 298 (1st ed. 1958):

> That the courts by their action usually recognize a distinction between interpretative rules and legislative rules is reasonably clear. The distinction seems to be an essential part of our system. Yet we have the benefit of only occasional judicial explanation of the distinction, and the Supreme Court apparently has never provided a full-bodied discussion of it. Indeed, the term "legislative rule" or "legislative regulation" apparently does not appear in any Supreme Court opinion. [Footnote omitted.]

> The distinction is important because courts often substitute judgment as to the content of an interpretative rule but almost always (theoretically always) refrain from substituting judgment as to the content of a legislative rule.

If this Court concludes that Ruling 1974–29 is a legislative rule, probably the courts would be required, after it had been through the notice and comment requirements of § 553, to accept the resulting ruling of DOE without substituting their own construction of the words "average daily production." This result would be undesirable and is unsupported by any prior controlling decision. Cf. *Batterton v. Francis*, 432 U.S. 416, l.c. 425, 97 S.Ct. 2399, l.c. 2405, 53 L.Ed.2d 448, l.c. 456 (1977).

## II

### *The Erroneous "Substantial Impact" Test*

It is argued in support of the contention that Ruling 1974–29 is legislative

---

4. It can reasonably be argued that the mention of interpretative rules in § 553(b) of the APA implies that all administrative agencies not for-

bidden to do so, are authorized to issue interpretative rules. [Footnote not part of quoted material.]

rather than interpretative, that the ruling, though classified as interpretative, must be found to be legislative if it had a "substantial impact." This contention is unsound in law and experience. The words "substantial impact" do not appear in § 553 [5] of the APA. They constitute an unwarranted judicial gloss on the statute misapplied in the context of these cases.

Even when a rule is legislative in form it will be treated as interpretative unless the administrative agency possesses and exercises delegated legislative authority in issuing it. The weight of persuasive and controlling legal authorities does not support application of this substantial impact test. 1 K. Davis, *Administrative Law Treatise* §§ 5.03, 5.04 (1st ed. 1958 and Supp. 1970); K. Davis, *Administrative Law of the Seventies* § 5.03–3, and Cumulative Supplement July 1977, l.c. 49, and authorities cited therein; *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In 1977 Professor Davis summarized the current state of the law and the rule of the *Gilbert* case, *supra*, as follows:

> Some courts have been recently departing from the dominant law about the distinction between legislative rules and interpretative rules. The dominant law is and has long been that the distinction rests on exercise of delegated power to make law through rules, or lack of exercise of such power; the dominant law is not and never has been that the distinction rests on substantial impact of rules, or lack of it. Some of the law discussed below in this section is at variance with what is here called the dominant law. But at the end of 1976 the Supreme Court rendered a very helpful opinion on the subject, declaring with clarity and force the law that has been dominant. In dealing with guidelines of the Equal Employment Opportunity Commission that differed from the Court's interpretation of a statute, the Court declared: "Congress . . . did not confer upon the EEOC authority to promulgate rules or regulations . .

This does not mean that EEOC guidelines are not entitled to consideration in determining legislative intent . . . But it does mean that courts properly may accord less weight to such guidelines than to administrative regulations which Congress has declared shall have the force of law . . . or to regulations which under the enabling statute may themselves supply the basis for imposition of liability." *General Electric Co. v. Gilbert*, 429 U.S. 125, 50 L.Ed.2d 162 [sic] (343), 97 S.Ct. 401 (1976). The Court went on to reject the guidelines, saying that they were not "contemporaneous interpretation," that the agency had earlier enunciated the opposite position, and that the Court had declined in the past to follow administrative guidelines where they conflicted with earlier pronouncements of the agency.

> *The guidelines had substantial impact on those affected by them. But that fact did not turn them into regulations having force of law.* The Court in accordance with the dominant law, ignored the substantial impact of the rules in deciding that they should be given less weight than force of law. The test the Court used, in accordance with the dominant law, was lack of delegation by Congress of authority to make rules having force of law. In absence of such a delegation, the rules cannot be legislative; in the Court's words, they cannot be "regulations which under the enabling statute . . . themselves supply the basis for imposition of liability." That the test is not substantial impact but is exercise of delegated power to make law through rules has been Supreme Court law for many decades, and the 1976 opinion confirms that the law to that effect continues. [Emphasis added.] K. Davis, *Administrative Law of the Seventies* § 5.03–3, Cumulative Supplement July 1977, l.c. 49, 50.

The substantial impact test is illogical because every significant interpretative

---

**5.** Only in § 7(i)(1)(C) of the FEAA is the term "substantial impact" mentioned in relevant energy statutes. As shown later § 7(i) is not applicable to Ruling 1974–29.

rule choosing between two or more interpretations of a legislative rule or a statute has an effect ("substantial impact") on the hopes, desires, expectations or beliefs of some of those regulated by the rule or statute. So, under the "substantial impact" test every significant interpretative rule automatically becomes a legislative rule by virtue of its effect. There is nothing in the APA to warrant employment of the "substantial impact" test to classify interpretative and legislative rules. The phrase "substantial impact" does not appear in the APA.

What then, under the APA, is the proper meaning and use of the phrase "substantial impact" in some cases? One proper meaning and use of the phrase is to determine whether administrative action under a legislative rule or regulation *issued without compliance with the APA notice and comment procedures* should be invalidated. The concept is akin to the harmless error doctrine of the courts. Such a case was *National Helium Corporation v. FEA, supra*, 569 F.2d 1137. In that case this Court found that FEA had admittedly violated the APA by adopting legislative amendments to Part 212 of Title 10 C.F.R., price regulations, on April 5, 1974, without granting the notice and opportunity to comment required by the APA. This Court then proceeded to determine whether the lack of compliance with the notice and comment requirements of the APA was "fatal." Relying in part on *California v. Simon* (Emp. App.1974) 504 F.2d 430, *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974), this Court concluded:

When the questioned agency action does not jeopardize substantive rights or have a "substantial impact" on the purportedly regulated parties, or "create substantive effects upon the rights of the parties not involved in the proceedings," *then lack of compliance with the prior notice and comment requirements of the APA is not fatal.*

\*    \*    \*    \*    \*    \*

We conclude that *neither substantive nor procedural inadequacies in the refiner*

*price rules*, as applied to gas processors, warrant allowing gas processors to operate unrestricted for the period at issue. [Emphasis added.] 569 F.2d l.c. 1146.

The case of *California v. Simon, supra*, was a similar case.

From the foregoing it is clear that the erroneous "substantial impact" test, advocated in these cases by appellees, was not employed in the *National Helium Corporation* case to determine whether a rule was interpretative or legislative. It was properly employed to determine whether to invalidate action under a regulation adopted without compliance with the notice and comment requirements of APA.

The following illustrative cases demonstrate the proper use and misuse of the "substantial impact" factor:

Case No. 1:

An administrative agency has no delegated power to issue legislative regulations. Nevertheless it promulgates a regulation legislative in form that has "substantial impact." The regulation will be treated as having no binding effect (interpretative) despite the substantial impact. This is *General Electric Co. v. Gilbert, supra*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

Case No. 2:

An administrative agency has delegated power to issue legislative regulations and interpretative rules. It issues a regulation interpretative in form and substance which may have "substantial impact" on the hopes, desires or expectations of regulated parties. The regulation is interpretative despite the possibility of such substantial impact. This case is similar to these cases.

Case No. 3:

An administrative agency has delegated power to issue legislative regulations and interpretative rules. It issues a regulation legislative in form and substance without complying with the prior notice and comment procedures of § 553(b) and(c) of the APA. The invalid regulation has no substantial impact. The courts will not reverse the adminis-

trative action under the invalid regulation. This is *National Helium Corporation v. FEA* (Emp.App.1977) 569 F.2d 1137.

Case No. 4:

An administrative agency, subject to the requirements of the APA and § 7(i) of the FEAA, has delegated power to issue legislative regulations and interpretative rules. The agency issues a legislative regulation having future effect, and having substantial impact, without complying with the notice and comment procedures of § 7(i). The regulation is invalid. This is *Shell Oil Co. v. FEA* (Em.App.1978) 574 F.2d 512.

In a minority view, it was once permissible to employ a "substantial impact" test to create a common law rule that required prior notice and comment procedures when the APA does not require them. 1 K. Davis, *Administrative Law Treatise* § 6:30, l.c. 594, and § 6:31, l.c. 596–599 (2d ed. 1978); K. Davis, *Administrative Law of the Seventies* § 5.03–3, and Cumulative Supplement July 1977, l.c. 50. This minority view was applied sparingly, in some jurisdictions, until the Supreme Court of the United States unanimously decided the case of *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), construing § 553 of the APA to require a contrary result. Direct quotations from the opinion of the Supreme Court of the United States in the *Vermont Yankee Nuclear Power Corp.* case, *supra*, are the best evidence of its holdings. The quotations follow:

"In 1946, Congress enacted the Administrative Procedure Act, which as we have noted elsewhere was not only 'a new, basic and comprehensive regulation of procedures in many agencies,' *Wong Yang Sung v. McGrath*, 339 U.S. 33 [70 S.Ct. 445, 94 L.Ed. 616] (1950), but was also a legislative enactment which settled 'long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest.' *Id.*, at 40 [70 S.Ct. 448]. Section 4 of the Act, [5 U.S.C. § 553 (1976 ed.)], dealing with rulemaking, requires in subsection (b) that 'notice of proposed rule making shall be published in the Federal Register . . .,' describes the contents of that notice, and goes on to require in subsection (c) that after the notice the agency 'shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.' Interpreting this provision of the Act in *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742 [92 S.Ct. 1941, 32 L.Ed.2d 453 (1972)], and *United States v. Florida East Coast R. Co.*, 410 U.S. 224 [93 S.Ct. 810, 35 L.Ed.2d 223 (1973)], we held that generally speaking this section of the Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures. Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare.

"Even apart from the Administrative Procedure Act this Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments. In *FCC v. Schreiber*, 381 U.S. 279, 290 [85 S.Ct. 1459, 14 L.Ed.2d 383 (1965)], the Court explicated this principle, describing it as 'an outgrowth of the congressional determination that administrative agencies and administrators will be familiar with the industries which they regulate and will be in a

better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved.' 435 U.S. l.c. 523–525, 98 S.Ct. l.c. 1201, 1202, 55 L.Ed.2d l.c. 467, 468. [Footnote omitted.]

"* * * * * *

"In prior opinions we have intimated that even in a rulemaking proceeding when an agency is making a ' "quasi-judicial" ' determination by which a very small number of persons are ' "exceptionally affected, in each case upon individual grounds," ' in some circumstances additional procedures may be required in order to afford the aggrieved individuals due process. *United States v. Florida East Coast R. Co.*, 410 U.S., at 242, 245 [93 S.Ct. 810], quoting from *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 446 [36 S.Ct. 141, 60 L.Ed. 372 (1915)]. It might also be true, although we do not think the issue is presented in this case and accordingly do not decide it, that a totally unjustified departure from well-settled agency procedures of long standing might require judicial correction.

"But this much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' *FCC v. Schreiber*, 381 U.S., at 290 [85 S.Ct. 1459], quoting from *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, at 143, 60 S.Ct. 437, 84 L.Ed. 656. Indeed, our cases could hardly be more explicit in this regard. The Court has, as we noted in *FCC v. Schreiber*, 381 U.S., at 290 and n. 17 [85 S.Ct. 1459], upheld this principle in a variety of applications, including that case where the District Court, instead of inquiring into the validity of the FCC's exercise of its rulemaking authority, devised procedures to be followed by the agency on the basis of its conception of how the public and private interest involved could best be served. Examining § 4(j) of the Communications Act of 1934, the Court unanimously held that

the Court of Appeals erred in upholding that action. And the basic reason for this decision was the Court of Appeals' serious departure from the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure. 435 U.S. l.c. 542–544, 98 S.Ct. l.c. 1211, 1212, 55 L.Ed.2d l.c. 478, 479. [Footnotes omitted.]

"* * * * * *

"There are compelling reasons for construing § 4 in this manner. In the first place, if courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the 'best' or 'correct' result, judicial review would be totally unpredictable. And the agencies, operating under this vague injunction to employ the 'best' procedures and facing the threat of reversal if they did not, would undoubtedly adopt full adjudicatory procedures in every instance. Not only would this totally disrupt the statutory scheme, through which Congress enacted 'a formula upon which opposing social and political forces have come to rest,' *Wong Yang Sung v. McGrath*, 339 U.S., at 40 [70 S.Ct. 445], but all the inherent advantages of informal rulemaking would be totally lost.

"Secondly, it is obvious that the court in these cases reviewed the agency's choice of procedures on the basis of the record actually produced at the hearing [*Natural Resources Defense Council, Inc. v. U. S. Nuclear Regulatory Commission*], 178 U.S.App. D.C. [336], at 347, 547 F.2d [633], at 644, and not on the basis of the information available to the agency when it made the decision to structure the proceedings in a certain way. This sort of Monday morning quarterbacking not only encourages but almost compels the agency to conduct all rulemaking proceedings with the full panoply of procedural devices normally associated only with adjudicatory hearings.

"Finally, and perhaps most importantly, this sort of review fundamentally misconceives the nature of the standard for judicial review of an agency rule. The court below uncritically assumed that additional

procedures will automatically result in a more adequate record because it will give interested parties more of an opportunity to participate and contribute to the proceedings. But informal rulemaking need not be based solely on the transcript of a hearing held before an agency. Indeed, the agency need not even hold a formal hearing. See 5 U.S.C. § 553(c) (1976 ed.). Thus, the adequacy of the 'record' in this type of proceeding is not correlated directly to the type of procedural devices employed, but rather turns on whether the agency has followed the statutory mandate of the Administrative Procedure Act or other relevant statutes. If the agency is compelled to support the rule which it ultimately adopts with the type of record produced only after a full adjudicatory hearing, it simply will have no choice but to conduct a full adjudicatory hearing prior to promulgating every rule. In sum, this sort of unwarranted judicial examination of perceived procedural shortcomings of a rulemaking proceeding can do nothing but seriously interfere with that process prescribed by Congress. 435 U.S. l.c. 546–548, 98 S.Ct. l.c. 1213, 1214, 55 L.Ed.2d l.c. 481, 482 [Footnote omitted.]

"\* \* \* \* \* \*

"In short, nothing in the APA, NEPA, the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed at least the statutory *minima*, a matter about which there is no doubt in this case. 435 U.S. l.c. 548, 98 S.Ct. l.c. 1214, 55 L.Ed.2d l.c. 482."

Appellees' contentions in these appeals cannot be approved under the decision in the *Vermont Yankee Nuclear Power Corp.* case, *supra*.

## III

### There Was No Substantial Impact In These Cases

■ Assuming for purposes of discussion only that the "substantial impact" test de-

termines whether an administrative rule is "interpretative" or "legislative," Ruling 1974–29 had no substantial impact on appellees.

If Ruling 1974–29 was a reasonable interpretation of the stripper well statutory exception of EPAA and TAPAA, or of 10 C.F.R. § 210.32, or both, it had no impact. In that event the impact came from the statute and valid legislative regulation being interpreted, not from the interpretative ruling.

It is submitted that Ruling 1974–29 is a reasonable interpretation of the term "average daily production" as used in § 406 of TAPAA, § 4(e)(2)(A) of EPAA, and in 10 C.F.R. § 210.32(b). As such it had no "impact" if such be a test. The "impact," if any, resulted earlier from the statute and from the regulation 10 C.F.R. § 210.32(b) found to be valid by the district court. The interpretation of § 406 of TAPAA and § 4(e)(2)(A) of EPAA to exclude injection wells in computing "average daily production" was a reasonable contemporaneous construction of the statute and created no new law or legislative rule.

## IV

### The Department of Interior and Other Regulations

■ The appellees seek to demonstrate the existence of substantial impact, caused by Ruling 1974–29, by claiming that a regulation 30 C.F.R. § 221.49(b) of the Department of the Interior (DOI) authorized inclusion of injection wells in computing average daily output. It is argued that "since 1936 the DOI has treated injection wells as wells for the purposes of determining 'average daily production' per well" of a stripper property. This factual contention is supported only by citations to 30 C.F.R. § 221.-49(b), 30 C.F.R. Part 221, and factual conclusions contained in appellees' motion for summary judgment (R. 514–515). The cited regulations themselves disprove the broad conclusions of appellees that the cited regu-

lation gives any right to count "injection wells" in the computation of "average daily production" per well. "Injection wells" as such are not mentioned in the regulations cited unless they qualify as "input wells" mentioned in 30 C.F.R. § 221.49(b), which reads as follows:

> (b) Wells approved by the supervisor as input wells shall be counted as producing wells for the entire month if so used 15 days or more during the month and shall be disregarded if so used less than 15 days during the month.

The entire 30 C.F.R. § 221.49 is set out as an addendum to show that appellees in their conclusions have overstated the language and effect of the DOI regulations. In that regulation, with the limited possible exceptional conditional privilege of counting input wells as producing wells (when approved in the discretion of the supervisor), the regulation clearly permits the count of "only wells which yield a commercial volume of production during at least part of the month. . . ." Similar unpersuasive references are made by appellees to immaterial Rule 48 of the Texas Railroad Commission and World War II regulations of the Office of Price Administration (OPA). An examination of OPA interpretative bulletins will show that OPA could not have performed its administrative obligations without the power to issue interpretations of its regulations having substantial impact. From these immaterial and obscure references, unmentioned in any legislative history of EPAA or of TAPAA, appellees argue that they had a reasonable expectation that, prior to the issuance of Ruling 1974–29, they could count injection wells in computing the average daily production of "stripper wells," and that Ruling 1974–29 was the first notice they had to the contrary. This contention is lacking in factual or legal merit. Appellees have not shown any "substantial impact" or a reasonable expectation that injection wells would be counted in the formula despite the fact that no crude oil or condensates were received therefrom. No basis for such a reasonable expectation existed. This is clearly developed and soundly concluded in the excellent opinion of Judge Luther B. Eubanks in *Grace Petroleum Corporation v. DOE* (W.D.Okl.1978) 456 F.Supp. 945.

V

*Effect of The Federal Energy Administration Act*

■ Appellees argue that § 7(i) of FEAA, *supra*, imposed stringent new rule-making requirements on FEA that are applicable in determining the validity of Ruling 1974–29; that the requirements of the APA and also these new requirements must be met by FEA in issuing Ruling 1974–29; and that FEA failed to do so. In support of this contention *amici curiae* cite *Shell Oil Company v. FEA* (Em.App.1978) 574 F.2d 512.

The contention of appellees is lacking in merit because § 7(i) of FEAA does not apply to interpretative rules, such as Ruling 1974–29, exempted by the APA.

By its express governing and limiting provision, § 7(i) applied only to rules "as defined in § 551(4) of Title 5," a part of the APA. The scope of § 7(i) of FEAA, relating to rules, regulations and procedures of energy administration, was expressly limited to rules, regulations and orders having the applicability and effect of a rule as defined in § 551(4) of the APA. Subsections 7(i)(1)(A) and (B) of the FEAA expressly so provide in the following paragraphs of § 7(i) of the FEAA:

> (i)(1)(A) Subject to paragraphs (B), (C), and (D) of this subsection, the provisions of subchapter II of chapter 5 of title 5, United States Code, shall apply to any rule or regulation, or any order having the applicability and effect of a rule as defined in section 551(4) of title 5, United States Code, issued pursuant to this Act, including any such rule, regulation, or order of a State or local government agency, or officer thereof, issued pursuant to authority delegated by the Administrator.

(B) Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulation, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order. In addition, public notice of all rules, regulations, or orders described in paragraph (A) which are promulgated by officers of a State or local government agency shall to the maximum extent practicable be achieved by publication of such rules, regulations, or orders in a sufficient number of newspapers of statewide circulation calculated to receive widest possible notice.

The express reference to § 551(4) of the APA, as defining the type of rule, regulation or order for which the procedure of § 7(i) is required, incorporates § 551(4) in § 7(i). Section 551(4) of the APA is as follows:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and *future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing. [Emphasis added.]

Section 7(i)(1)(A) of the FEAA expressly by reference affirmed the coverage of the remaining provisions of the APA to rules that did not have future effect.

A rule, such as Ruling 1974–29, interpreting an existing statute or existing legislative regulation relating in time back to the enactment of the statute or adoption of the regulation is not a rule having a *"future effect"* as defined in § 551(4) Title 5 U.S.C. Therefore it is not subject to the provisions of § 7(i) of the FEAA. Interpretative rules simply state what the statute or regulation has always meant in the opinion of the administrative agency issuing the interpretative rule. Any other view would destroy the clear exemption contained in § 553(b) of the APA expressly reaffirmed in § 7(i)(1)(A) of the FEAA.

*Shell Oil Company v. FEA, supra* (Em. App.1978) 574 F.2d 512, illustrates the point. In that case the validity of a regulation establishing future prices of unleaded gasoline was issued on July 1, 1974, by FEO (predecessor to FEA). The pricing regulation in question was a legislative, rather than an interpretative, rule of general applicability, to have *"future effect"* as defined in § 551(4) of the APA. This was not seriously questioned. As such it was subject to the notice and comment procedures of § 553 of the APA and § 7(i) of the FEAA. Under these circumstances, finding that FEA did not comply with the APA and the FEAA, this Court did not hesitate to hold that the challenged price regulation was invalid. In that case the substantial impact problem did not appear because the presence of substantial impact was not in doubt.

The opinion in *Shell Oil Company v. FEA, supra,* is not controlling here because Ruling 1974–29 was not a legislative rule having future effect as defined in § 551(4) of the APA. It was an interpretative rule having no future effect. It clarified the past and continuing nature of the stripper well exemption of EPAA, TAPAA and 10 C.F.R. § 210.32(b). As such it was exempt from the notice and comment procedures of both the APA and the FEAA. The legislative history as well as the express provisions of the APA and FEAA make this clear.

Because the FEAA and § 7(i) thereof are clearly inapplicable to Ruling 1974–29, the references to the legislative history of the FEAA and to *Shell Oil Company v. FEA, supra,* are irrelevant.

## VI

The contention of appellees that the Department of Energy (DOE) as successor to FEA must start anew and comply with the notice and comment requirements of the APA and FEAA in respect to Ruling 1974–29 is a sterile concept. If DOE starts anew and gives notice and opportunity to comment under § 553 of APA and § 7(i) of FEAA it can reissue Ruling 1974–29 and possibly make it retroactive under the doctrine of the *National Helium Corporation* case, *supra,* and *California v. Simon, supra.*

In the meantime the vast number of interpretative rulings of other administrative agencies, affected by the application of appellees' arguments, if accepted, would create chaos in federal administrative agencies, disturb settled legal doctrines and spawn much needless litigation.

Even if it is assumed contrary to fact that Ruling 1974–29 should have but did not comply with § 553(b) of the APA and § 7(i) of FEAA, there is no fundamental unfairness in its application to appellees, and it should be upheld. *National Helium Corporation v. FEA, supra; California v. Simon, supra.* There is no fundamental unfairness in the application of Ruling 1974–29 because it is a reasonable interpretation of the stripper well exemption of EPAA, TAPAA and the regulation 10 C.F.R. § 212.32(b).

In each of these actions the judgment is reversed and the action remanded for further proceedings consistent with this opinion.

## ADDENDUM

§ 221.49 Royalty rates on oil; sliding- and step-scale leases (public land only).

Sliding- and step-scale royalties are based on the average daily production per well. The supervisor shall specify which wells on a leasehold are commercially productive, including in that category all wells, whether produced or not for which the annual value of permissible production would be greater than the estimated reasonable annual lifting cost, but only wells which yield a commercial volume of production during at least part of the month shall be considered in ascertaining the average daily production per well. The average daily production per well for a lease is computed on the basis of a 28-, 29-, 30-, or 31-day month (as the case may be), the number of wells on the leasehold counted as producing and the gross production from the leasehold. (Tables for computing royalty on the sliding-scale and on the step-scale basis may be obtained upon application to the supervisor.) The supervisor will determine which commercially productive wells shall be considered each month as producing wells for the purpose of computing royalty in accordance with the following rules, and in his discretion may count as producing any commercially productive well shut-in for conservation purposes:

(a) For a previously producing leasehold, count as producing for every day of the month each previously producing well that produced 15 days or more during the month, and disregard wells that produced less than 15 days during the month.

(b) Wells approved by the supervisor as input wells shall be counted as producing wells for the entire month if so used 15 days or more during the month and shall be disregarded if so used less than 15 days during the month.

(c) When the initial production of a leasehold is made during the calendar month, compute royalty on the basis of producing well-days.

(d) When a new well is completed for production on a previously producing leasehold and produces for 10 days or more during the calendar month in which it is brought in, count such new wells as producing every day of the month, in arriving at the number of producing well-days. Do not count any new well that produces for less than 10 days during the calendar month.

(e) Consider "head wells" that make their best production by intermittent pumping or flowing as producing every day of the month, provided they are regularly operated in this manner, with approval of the supervisor.

(f) For previously producing leaseholds on which no wells produced for 15 days or more, compute royalty on a basis of actual producing well-days.

(g) For previously producing leaseholds on which no wells were producing during the calendar month but from which oil was shipped, compute royalty at the same royalty percentage as that of the last preceding calendar month in which production and shipments were normal.

(h) Rules for special cases not subject to definition, such as those arising from averaging the production from two distinct sands or horizons when the production of one sand or horizon is relatively insignificant compared to that of the other, shall be made by the supervisor as need arises.

(i)(1) In the following summary of operations on a typical leasehold for the month of June, the wells considered for the purpose of computing royalty on the entire production of the property for the months are indicated.

| Well No. | Record | Count (marked X) |
|---|---|---|
| 1 | Produced full time for 30 days | X |
| 2 | Produced for 26 days; down 4 days for repairs _____ | X |
| 3 | Produced for 28 days; down June 5, 12 hours, rods; June 14, 6 hours, engine down; June 25, 24 hours; June 26, 24 hours, pulling rods and tubing _____ | X |
| 4 | Produced for 12 days; down June 13 to 30 _____ | |
| 5 | Produced for 8 hours every other day (head well) _____ | X |
| 6 | Idle producer (not operated) ___ | |
| 7 | New well, completed June 17; produced for 14 days _____ | X |
| 8 | New well, completed June 22; produced for 9 days _____ | |

(2) In this example there are eight wells on the leasehold, but wells 4, 6, and 8 are not counted in computing royalties. Wells 1, 2, 3, 5, and 7 are counted as producing for 30 days. The average production per well per day is determined by dividing the total production of the leasehold for the month (including the oil produced by wells 4 and 8) by 5, the number of wells counted as producing, and dividing the quotient thus obtained by the number of days in the month.

CHRISTENSEN, Judge, concurring:

While concurring in the result reached above and with most of Judge Becker's analysis and reasoning, I feel constrained to add the following comments.

I am troubled by the unqualified assertion that there is nothing in the APA to warrant employment of the "substantial impact" test to classify interpretative and legislative rules. Whether a regulation is a mere "interpretation" under some circumstances cannot be evaluated confidently without consideration of its effect upon the industry and the public from the viewpoints of essential fairness, due process, departure from established practices and financial or other consequences. Nor do I believe the test is as simple as the ascertainment of what administrative rulings would require a legislative grant from Congress, all others necessarily being interpretive. I do not so understand *General Electric Co. v. Gilbert,* vis-a-vis *Batterton v. Francis,* despite the quotation from Professor Davis concerning the former. *Batterton* involved the particularized delegation of legislative authority. The point in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel,* was that rulemaking procedures beyond the concededly applicable requirements of APA may not be insisted upon by the courts, not that the necessity of minimum rulemaking procedures could be avoided under the guise of "interpretations" to the extent applicable. Even as to the issue involved there the possibility of exception under some circumstances was noted. The abrasion of due process, principled fairness, long standing practices, and other impacts may be more relevant to the determination of whether a purported "interpretation" is really "legislative" in character than the detailed procedures through which admit-

tedly essential rulemaking is to be handled by an agency.

Nor do I agree that the propriety of an agency "interpretation" necessarily is measured by what a court itself might do in the interpretation of a statute or regulation. Courts may have no recourse but to interpret these in accordance with the implied intent of Congress or as an alternative to a declaration of invalidity for constitutional infirmity. An agency often has greater flexibility and wider duty, including the obtaining of the input of additional viewpoints, practical as well as legal, through observance of rulemaking procedures to the extent mandated by the APA and, within its terms, by the FEAA.

The qualifications expressed above are not decisive in this particular case—if, indeed there is anything in Judge Becker's opinion intended to be irreconcilable with them. Notwithstanding some cross currents engendered by a considerable stirring of waters in the arguments, no significant impacts appear to operate against the ruling in question. And a holding that "a well which produces crude petroleum" means, as contemplated by the properly adopted and subsisting regulations and in view of the seminal statute, a well that produces or yields such petroleum directly rather than one which may be utilized as a part of a system to obtain indirectly crude petroleum from a producing well, seems essentially the sort of an interpretation that must have been intended by the APA exception to the rulemaking requirement.

ZIRPOLI, Judge, dissenting:

For the reasons stated below, I must respectfully dissent.

This is an appeal by the Secretary of Energy from a decision of the district court declaring a ruling of the Federal Energy Administration ("FEA")[1] procedurally invalid and enjoining the agency from enforcing it against the seven plaintiff-appellees. The district court found FEA Ruling 1974–29, 39 Fed.Reg. 44414 (1974) invalid because the agency failed to employ the notice and comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. section 553(b). I would affirm the district court.

In three separate actions filed in the district court for the District of Kansas, plaintiffs and intervenors, seeking declaratory and injunctive relief, challenged the ruling on procedural and substantive grounds. After the plaintiffs in *Energy Reserves Group, Inc.* obtained a preliminary injunction enjoining the enforcement of any final agency order based on Ruling 1974–29, the parties in all three actions entered into a stipulation consolidating the cases for a ruling from the court on three issues:

1. Whether Ruling 1974–29 issued by the FEA on December 24, 1974, 39 Fed. Reg. 44414, is arbitrary, unreasonable or in conflict with the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. §§ 1651, *et seq.*, and the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. §§ 751, *et. seq.*

2. Whether Ruling 1974–29 was issued by the FEA in compliance with the APA, 5 U.S.C. § 553.

3. If Ruling 1974–29 is valid, whether the Ruling may be applied to the plaintiffs' sales of crude oil prior to December 24, 1974, the date on which the Ruling was issued by the FEA.

On cross-motions for summary judgment, the district court, without reaching the issues of the substantive validity of the ruling, or of the propriety of its retroactive application, found the ruling procedurally defective because of the agency's failure to afford interested parties an opportunity to comment on the proposed rule, as required by the APA.

*The Stripper Well Exemption*

The price which producers of domestic crude oil could lawfully charge for their product has been subject to regulation since

---

1. On October 1, 1977, the Department of Energy assumed the duties of the FEA pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 42 U.S.C. § 7101, *et seq.*, and Executive Order No. 12009, 42 Fed.Reg. 46267 (1977). I will refer, however, to the FEA, rather than to the DOE, since we are here concerned with the action of the former agency.

August 1973.[2] Recognizing, however, that certain oil producing properties could not be operated profitably under the price ceiling, Congress exempted such marginal properties from price controls in two pieces of legislation—the Trans-Alaska Pipeline Authorization Act ("TAPAA"), 43 U.S.C. §§ 1651, et seq., and the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. §§ 751, et seq.[3] Section 4(e)(2)(A)[4] of the EPAA provided that:

> The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

Oil produced from wells generating no more than ten barrels per day—commonly known as stripper wells—was thus exempt from domestic crude oil price controls. The exemption was motivated by the fear that stripper wells, whose per barrel cost of extracting oil is higher than it is for more productive wells, could not operate profitably under price controls and would be shut down, thus depriving the nation of the substantial amount of crude oil they produce.[5]

In section 4(e)(2)(C) of the EPAA, Congress delegated legislative authority to the Cost of Living Council ("CLC") to promulgate regulations implementing the stripper well exemption. The regulations defined certain of the relevant terms, but failed to define precisely the term "well," except

2. The Cost of Living Council ("CLC") issued regulations establishing the two-tier oil pricing system pursuant to the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note. These regulations were subsequently adopted pursuant to the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751, et seq. This court has addressed certain issues presented by the two-tier system of crude oil prices and upheld various aspects of the system in Griffin v. United States, 537 F.2d 1130 (Em.App.1976), cert. denied, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 286 (1976); Cities Service Co. v. FEA, 529 F.2d 1016 (Em.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); Pasco Inc. v. FEA, 525 F.2d 1391 (Em.App.1975); Consumers Union of United States, Inc. v. Sawhill, 525 F.2d 1068 (Em.App. 1975); and Nader v. Sawhill, 514 F.2d 1064 (Em.App.1975).

3. The EPAA stripper exemption became law on November 27, 1973, eleven days after the TAPAA exemption, which it superseded.

4. This section was repealed on December 22, 1975, by section 401 of the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 946. The stripper well exemption was reinstated in an amendment to the EPAA contained in section 121 of the Energy Conservation and Production Act, Pub.L. No. 94–385, 15 U.S.C. § 757(i), enacted on August 14, 1976. The FEA implemented the exemption through the issuance of regulations contained at 10 C.F.R. § 212.54.

5. The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act (now in Phase IV) and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons. As of January 1, 1973, there were 350,000 stripper wells producing ten barrels a day or less. Stripper wells account for 71 percent of all of the oil wells in this country, but produce an average of only 3.6 barrels per day, or only 13 percent of total U.S. domestic crude production.

Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production, they are shut in, and a known and developed crude oil reserve is lost to U.S. production. Removing Phase IV price restraints from these marginal stripper wells has the effect of increasing the value of the crude oil they produce by about $1.30 per-barrel (the difference between $4.02, the current per-barrel ceiling average under Phase IV, and $5.32, the per-barrel average price for "new" domestic crude oil production which is not subject to Phase IV). This price incentive will encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market.

TAPAA Conf.Rep. No. 93–624, 93rd Cong., 1st Sess., [1973] U.S.Code Cong. & Admin.News, pp. 2523, 2531–32 [hereinafter referred to as TAPAA Conf.Rep.].

perhaps by implication.[6]  It was this gap in the regulatory scheme, later sought to be cured through the issuance of Ruling 1974–29, that lies at the foundation of this lawsuit, for appellees contend that certain types of wells, known as injection wells, should be counted for purposes of determining the average daily production of the wells on a particular property.  The FEA sought to exclude such wells through the issuance of an "interpretation" of its earlier regulation, which had exempted stripper well leases from price controls and defined stripper well leases in terms of average daily production per well.

A crude oil producing property typically passes through two stages—the initial, or primary production phase, and the later, or secondary recovery phase.  During the primary production stage, oil is brought to the surface by means of the natural pressure in an underground oil reservoir.  When the reservoir is depleted to the degree that its internal pressure is no longer sufficient to push the oil to the surface, secondary recovery techniques may be used.  Secondary recovery involves the injection of fluids into the producing formation to drive the crude oil to the surface, and injection wells are used for this purpose.  Such wells do not produce petroleum in the sense that oil is brought to the surface through them, but they do contribute to or make possible the recovery of petroleum via other wells on the property.  The CLC regulations implementing the stripper well exemption defined a stripper well lease as one in which production did not exceed ten barrels per well per day, and those regulations, insofar as they defined or limited the term "well" at all, did so by making reference to "the number of wells which produced crude petroleum . . . from that property in that year." [7]

These regulations were published on December 14, 1973, approximately one month after the stripper well exemption was created in the EPAA and TAPAA.  A year later, on December 24, 1974, the FEA issued Ruling 1974–29, which, purporting to interpret the implementing regulation, stated that the FEA did not consider injection wells to be wells for purposes of the exemption.[8]  Appellees all hold interests in crude oil producing properties that would qualify

6.  [6 C.F.R.] § 150.54 Certain price adjustments.

. . . . .

(s) *Stripper Wells*—(1) *Rule.*  Effective November 27, 1973, the price charged for the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease is exempt.

(2) *Definitions.*  As used in this paragraph "Average daily production" means the qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of calendar days in that year times the number of wells which produced crude petroleum and petroleum condensates including natural gas liquids from that property in that year.  To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production.

"Domestic crude petroleum" means crude petroleum produced in any of the several States, or the District of Columbia or from the "outer continental shelf" as defined in 43 U.S.C. 1331.

"First sale" means the first transfer for value by the producer or royalty owner.

"Property" is the right which arises from a lease in existence in 1972 or from a fee interest to produce domestic crude petroleum in existence in 1972 and is coextensive with that property used in paragraph (b) of this section for purposes of determining "base production control level."

"Stripper well lease" means a "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year.

38 Fed.Reg. 34465 (1973).

7.  *Id.*

8.  [Ruling 1974–29]
PRODUCTION WELLS FOR PURPOSES OF THE "STRIPPER WELL LEASE" EXEMPTION
*Facts.*  Firm P, a producer of petroleum, produced during the preceding calendar year 150,000 barrels of crude petroleum and petroleum condensates, including natural gas liquids from 40 production wells located on

for the exemption only if injection wells can be included in the computation. Plaintiff-appellee Braden-Zenith, Inc., for example, alleged in its complaint that it owns an interest in an oil producing property that yielded approximately 80 barrels of crude oil per day for the 12-month period ending September 30, 1976. There were 14 wells on the property during that year, nine of them injection wells, without which no oil at all could have been obtained. Thus, if all 14 wells are counted for purposes of computing average production per well, Braden-Zenith would have been exempt from price controls. Under Ruling 1974–29, however, the nine injection wells are not included in the computation, and the remaining five wells are deemed to have produced more than 10 barrels per day.

### Rulemaking under the APA

A. Legislative and Interpretative Rules

The APA [9] requires notice and an opportunity for interested persons to comment prior to the promulgation of a new rule. An exception to such formal rulemaking requirements, however, is provided in 5 U.S.C. § 553(b) for interpretative rules, and the FEA contends that Ruling 1974–29 is the epitome of an interpretative rule, since it merely seeks to define a term contained in an underlying regulation. *See Gibson Wine Co. v. Snyder,* 90 U.S.App.D.C. 135, 137, 194 F.2d 329, 331 (1952); *Continental Oil Co. v. Burns,* 317 F.Supp. 194, 198 (D.Del.1970). The mere fact that a rule appears to be definitional in form, however, does not preclude a finding that it is legislative rather than interpretative and thus subject to the formal rulemaking procedures of the APA. *See* 1 K. Davis, *Administrative Law Treatise* § 5.03 at 303 (1958) (discussing *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944)). If Congress has delegated lawmaking power to the agency, then rules issued pursuant to that grant are leg-

Property A, as defined in 10 CFR 210.32. In addition, there were five injection wells in operation on that property last year. An injection well is one which is used to inject water, air, gas, steam or other materials into the ground to assist in the recovery of crude petroleum through producing wells. Wells which formerly produced crude petroleum may be used for injection purposes, or new wells may be drilled solely for the purpose of injecting materials into oil-bearing formations and reservoirs.

The average daily production per well from Property A was 10.27 barrels, based on the 40 production wells, whereas the average daily production per well would be 9.13 barrels if 45 wells, including the 5 injection wells, were used to calculate the average daily production figure.

*Issue.* Is an "injection" well a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 CFR 210.32?

*Ruling.* No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease, is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calen-

dar year. "Average daily production" is further defined in 10 CFR 210.32(b) as:

The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of days in that year times the number of wells which produce crude petroleum and petroleum condensates, including natural gas liquids, from that property in that year.

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result.

39 Fed.Reg. 44414 (1974).

**9.** Section 4 of the APA, 5 U.S.C. § 553, was made applicable to the CLC by section 207 of the ESA. Section 207 of the ESA is incorporated into the EPAA by section 5 of the latter Act. 15 U.S.C. § 754(a)(1).

islative, whether such rules are cast in the form of definitions or in more traditional statutory form.[10] The existence of such a delegation of power does not limit an agency to the issuance of legislative rules, but if such a grant has been made, a reviewing court must determine into which category the rule falls, and that determination is constrained neither by the form of the rule nor by the label attached to it by the agency. *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir. 1972). The FEA's contention that Ruling 1974–29 defines a term contained in an underlying regulation and is therefore interpretative rather than legislative is particularly difficult to sustain in view of the fact that the agency itself chose to define the other central terms of the stripper well exemption through the issuance of a legislative regulation.[11]

Rather than be bound by the agency's own classification, many courts have attempted to discern the impact of the rule on regulated parties and have held those rules with substantial impact to be legislative and thus subject to formal rulemaking procedures. The FEA asserts that the substantial impact test has been discredited and abandoned as a means for distinguishing legislative from interpretative rules,[12]

but the agency's interment of the test appears to be premature. This court has recently had occasion to advert to the role of the substantial impact test in judicial review of administrative action, and the language of that case is particularly appropriate here:

In addition to the "good cause" exception to the notice and comment requirements of 5 U.S.C. § 553, there is an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." § 553(b)(3)(A). In construing this exception, rather than rely on a "facile semantic distinction" between interpretative rules and substantive or legislative rules, courts have looked instead to the "basic purpose of [the] statutory requirements [of notice and comment]" in deciding whether the requirements should be imposed. *Pharmaceutical Manufacturer's Association v. Finch,* 307 F.Supp. 858, 863 (D.Del.1970). When an agency action has "palpable effects" upon the regulated industry and the public in general, it is necessary to expose that action "to the test of prior examination and comment by the affected parties." *National Motor Freight Traffic Association v. United*

---

**10.** Davis, commenting on *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), characterized the result reached by the Supreme Court as follows:

The Court, in accordance with the dominant law, ignored the substantial impact of the rules in deciding that they should be given less weight than force of law. *The test the Court used, in accordance with dominant law, was lack of delegation by Congress of authority to make rules having force of law. In the absence of such a delegation, the rules cannot be legislative;* in the Court's words they cannot be "regulations which under the enabling statute . . . themselves supply the basis for imposition of liability."

K. Davis, *Administrative Law of the Seventies* § 5.03–3 at 50 (Cum.Supp.1977) (emphasis added). The Court in *Gilbert* was faced with the question of whether a regulation of the EEOC should be treated as having the force of legislation.

**11.** *See* n.6 *supra.*

**12.** *See, e. g., Eastern Kentucky Welfare Rights Organization v. Simon,* 165 U.S.App.D.C. 239, 251, 506 F.2d 1278, 1290–91 n.30 (1974) (sub-

stantial impact test not controlling where the rule is clearly interpretative in nature and without legally binding effect). Professor Davis takes the position that the substantial impact test should not be used to distinguish legislative from interpretative rules, and that the agency's characterization of its own action should control such classification. Davis states that the test may properly be used, however, to determine whether a particular rule, even though it is interpretative, should be subject to formal rulemaking requirements. *See* K. Davis *Administrative Law of the Seventies* § 5.03 at 148, § 6.01–7 at 193 (1976). Since interpretative rules are expressly exempted from the rulemaking requirements of section 4 of the APA, 5 U.S.C. § 553, however, it appears unlikely that, were Ruling 1974–29 found to be interpretative, the agency could be required to institute formal rulemaking in connection with its issuance. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

*States,* 268 F.Supp. 90, 96 (D.D.C.1967) (three judge court), aff'd per curiam, 393 U.S. 18 (1968).

The APA's rulemaking procedures "were designed to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969). The prior publication and opportunity for comment requirements enable "the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. FPC,* 412 F.2d 740, 744 (3 Cir. 1969). When the questioned agency action does not jeopardize substantive rights or have a "substantial impact" on the purportedly regulated parties, or "create substantive effects upon the rights of the parties not involved in the proceedings," then lack of compliance with the prior notice and comment requirements of the APA is not fatal. *Pennsylvania v. United States,* 361 F.Supp. 208, 220–22 (N.D.Pa.) (three judge court), aff'd, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.3d 310 (1973).

*National Helium Corp. v. FEA,* 569 F.2d 1137, 1145–46 (Em.App.1977).

### B. Ruling 1974–29 Had a Substantial Impact

While arguing that the test is an inappropriate one, the FEA asserts that the ruling in any event had no substantial impact. Whether one looks to the effect of the ruling on crude oil producers seeking to take advantage of the stripper well exemption or on the oil consuming public,[13] however, it is difficult to avoid the conclusion that it had a significant impact. The agency does not dispute the fact that the exclusion of injection wells from the computation of average daily production per well has a sharp economic impact on both producers and consumers. Appellant would have this court conclude, however, that such treatment of injection wells was mandated by Congress when it enacted the exemption, and that Ruling 1974–29 merely restated the obvious intent of the legislation.[14]

If Ruling 1974–29 were as clearly redundant as the FEA now asserts, this court might well find that it had no substantial impact. The subject of injection wells is not directly addressed, however, in the statute or its legislative history,[15] nor does the implementing regulation provide unambiguous guidance in this area. Moreover, contrary to the apparent assumption in appellant's argument, a finding that a rule has a substantial impact does not presuppose that the rule is inconsistent with the underlying statute or regulation. Were such a finding a necessary aspect of the test, then rules would be found procedurally defective only in those cases in which they could also be deemed substantively invalid. In the instant case, however, while I would find Ruling 1974–29 to have been issued in the absence of the required procedures and thus need not reach the question of its substantive validity, I note that a party challenging the substantive validity of an FEA regulation bears a heavy burden of persuasion.

Appellant argues further that Ruling 1974–29 had no substantial impact because it merely stated what the agency's interpretation of the statute and regulation had always been, and it notes that there is no indication in the record that the FEA ever construed the statute or regulation to permit the counting of injection wells. While the agency may not have altered its position with the issuance of Ruling 1974–29, however, it seems fair to conclude that appel-

---

13. *See* n.5 *supra.*

14. Were this court to find that Ruling 1974–29 was contrary to the intent of Congress when it created the stripper well exemption, of course, the ruling would be substantively invalid, regardless of the procedures employed in issuing it. *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Appellees would have us so conclude, but I need not reach this point.

15. Counsel for the FEA appear to concede the absence of clear guidance from Congress in this area when, addressing another issue at oral argument, he observed that the subject of injection wells was apparently not discussed when this legislation was enacted.

lees were first informed of the agency's views in this regard when the ruling was published. The stripper well exemption was enacted, and the regulation promulgated, against a long background of federal regulation of stripper properties. In its administration of section 17 of the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 226, for example, the Department of the Interior ("DOI") has, since 1936, permitted the counting of injection wells as producing wells for purposes of qualifying for a reduced royalty to the government when the average daily production of a lease is 10 barrels or less per well.[16] Appellant argues that the rule under scrutiny in the instant case, issued pursuant to a different statute and intended to fulfill a different function, cannot be judged in accordance with the treatment accorded injection wells by the DOI. The point, however, is not that the FEA's treatment of injection wells should necessarily be governed by the treatment of such wells by the DOI, but rather that producers had reasonable grounds for assuming that injection wells would be included in the computation of average daily production per well, and that Ruling 1974–29, not the statute or the underlying regulation, was the first effective notice to producers—particularly those, like plaintiff-appellee Marathon Oil Company, which had been operating on federal lands under DOI regulations—that injection wells were not to be counted in connection with the stripper exemption.

Appellees contend that the FEA has itself conceded the legislative nature of Ruling 1974–29 by arguing before the district court that, in evaluating the substantive validity of the rule, the court need only find a rational basis. Appellees assert that the rational basis test applies to legislative rules but that interpretative rules are subject to plenary judicial review, with the reviewing court free to substitute its judgment for that of the agency. The distinc-

tion between the scope of review for the two types of rules, however, is not as neat as appellees claim,[17] and this court has previously indicated that it considers the agency's interpretative rules worthy of considerable deference.[18] Such deference, however, imposes a concomitant obligation on the agency to issue rules having a substantial impact only after educating itself with regard to the wisdom of such rules. Shielded from the independent judgment of this court by the deference paid to its expertise, the agency should not at the same time deprive itself of comment from interested and experienced parties when it issues rules having a substantial impact on those parties.

*The Statutory Framework*

I am fortified in my conclusion that the FEA should have conducted formal rulemaking procedures before issuing Ruling 1974–29 by the legislative foundations of the stripper well exemption and of the agency itself. In Section 4(e)(2)(C) of the EPAA, Congress delegated authority to the administering agency to promulgate regulations implementing the stripper well exemption, and the House-Senate Conference Report on the TAPAA stripper exemption directed the agency to promulgate the necessary regulations before the exemption became operative.[19] That same Conference Report indicated that the regulations to be promulgated

> shall be so designed as to provide safeguards against any abuse, overreaching or altering of normal patterns of operations to achieve a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases to average down high production wells with a number of low production stripper

---

**16.** 30 C.F.R. § 221.49(b).

**17.** *See* K. Davis, *Administrative Law Treatise* § 5.05 (1958).

**18.** *See Southern Union Production Co. v. FEA,* 569 F.2d 1147, 1152 (Em.App.1978).

**19.** TAPAA Conf.Rep., n.5 *supra* at 2532.

wells to remove the high production wells from price ceilings.[20]

Appellant has pointed to the above language in support of its contention that the stripper exemption was to be narrowly construed and that Congress did not intend to permit the counting of injection wells for purposes of qualifying for the exemption. Whether or not the Report would be capable of supporting the weight appellant would place on it, it does seem clear that Congress intended potential abuses to be prevented through issuance of regulations. Appellant's argument, therefore, that the counting of injection wells is merely another form of gerrymandering is an argument that ultimately undermines the procedural validity of Ruling 1974–29, in view of the expressed congressional preference for rulemaking in this area.

Subsequent to the passage and implementation of the stripper well exemption but prior to the issuance of Ruling 1974–29, Congress enacted the Federal Energy Administration Act ("FEAA"), 15 U.S.C. §§ 761, et seq., which created the FEA. Section 7(i) of that Act, 15 U.S.C. § 766(i),[21] contains rulemaking provisions distinct from those of the APA, and this court has previously recognized the function of that section: [22]

> Congress recognized that the FEA's final judgment could only be as good as the information upon which it drew, and prescribed certain procedures—stricter than those of the [APA]—which would permit it to be educated by the most interested

and therefore, hopefully, the most knowledgeable parties. [citation omitted.] The agency's discretion, and thus its latitude for promulgating unwise rules, was to be restrained through this deliberately prescribed process for meaningful comment . . . .

*Shell Oil Co. v. FEA,* 574 F.2d 512, 516 (Em.App.1978).

Section 7(i) of the FEAA imposes upon the agency stricter rulemaking requirements than those contained in the APA. Section 7(i) requires the agency to publish the proposed rule itself in the Federal Register, whereas the APA merely requires an agency to publish a notice of proposed rulemaking. Section 7(i) narrows the APA's good cause exception to formal rulemaking by permitting a waiver of notice and comment only where the agency finds that strict compliance would cause serious harm or injury to the public health, safety, or welfare. Section 7(i), moreover, requires the agency to afford interested parties an opportunity to present their views and arguments orally whenever a proposed rule "is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses."[23] The legislative history of section 7(i), furthermore, reflects the intention of Congress that the agency interpret generously its obligation to give notice and receive comment on proposed rules. Rep. Broyhill, who introduced the amendment to the FEAA that was to be enacted as section 7(i), remarked upon

---

**20.** *Id.* at 2532–33.

**21.** Section 7(i)(1)(A)–(C) of the FEAA was repealed by section 709(a)(2)(C) of the Department of Energy Organization Act, n.1, *supra.* Section 7(i)(1)(A)–(C) was, however, in effect when Ruling 1974–29 was issued.

**22.** *Amici curiae,* the Kansas Independent Oil & Gas Association and the National Stripper Well Association, contend that section 7(i) of the FEAA required formal rulemaking in connection with the issuance of any rule, as that term is defined in the APA, 5 U.S.C. § 551(4). Under such a construction, it is clear that even interpretative rules, normally exempt from the rulemaking requirements of section 553, would be subject to formal rulemaking, for section 551(4) defines rules in a broad sense to include legisla-

tive, interpretative, and several other types of rules, such as rules of internal agency organization and procedure. The breadth of such a reading of section 7(i), however, renders it improbable, for we cannot assume, in the absence of a clear expression of legislative intent, that Congress subjected the FEA to the burden of formal rulemaking in instances where such procedures have generally been recognized to be unnecessary. The reading suggested by appellant, that section 7(i) mandated the manner of giving notice of a proposed rule when such notice was otherwise mandated by the APA, seems a more reasonable construction.

**23.** 15 U.S.C. § 766(i)(1)(C).

the impact that would flow from many of the actions taken by the agency and the importance that the agency act only after obtaining the benefit of comment from interested and knowledgeable persons.[24] The Conference Report similarly emphasized the importance of formal rulemaking:

It is expected that the exception to the notice provision in paragraph (B) of section 7(i) of the conference substitute will be used very sparingly.

\* \* \* \* \* \*

The conferees intend that if the Administrator is in doubt about the applicability of any of the standards provided in this section, he will resolve the doubt in favor of the fullest application of procedural safeguards.[25]

While I believe that the FEA's obligation to employ formal rulemaking procedures in its promulgation of Ruling 1974–29 can be discerned in the APA itself, without regard to the agency's specific statutory framework, it is clear that Congress intended the FEA to proceed with an extra measure of caution, a caution deemed advisable in the case of a new agency whose actions would necessarily have widespread impact on the economy. In view of the clear and substantial impact of Ruling 1974–29, on consumers as well as producers of crude oil, the agency was required to observe formal rulemaking procedures.[26]

## Jurisdiction

Although the parties to this appeal did not address the issue of jurisdiction in their briefs, this court raised the matter at oral argument. Some concern was expressed, and some confusion on the part of counsel

manifested, with regard to the reviewability of the ruling at issue. In *Atlantic Richfield Co. v. FEA,* 556 F.2d 542 (Em.App. 1977), this court discussed the narrow circumstances under which interpretations issued by the FEA would be subject to judicial review. The factors there found to justify judicial review—the collateral estoppel effect on the persons who were both directly involved in the transaction and parties to the interpretation proceedings— would not appear to be present here, for, unlike the interpretations involved in that case, here there were no parties to the issuance of the ruling. The interpretations in *Atlantic Richfield* were issued pursuant to 10 C.F.R. Part 205 Subpart F, §§ 205.80– 205.86. Interpretations issued pursuant to that portion of the regulations are arrived at on the basis of requests and information submitted by particular parties. Such interpretations apply to and may be relied upon only by those persons to whom they are specifically addressed and other persons, directly involved in the same transaction or act, upon whom the FEA serves the interpretations.[27]

The ruling at issue here, however, is another creature entirely. It was issued pursuant to 10 C.F.R. Part 205 Subpart K, §§ 205.150–205.154. Such rulings, though subject to modification or rescission like Subpart F interpretations, are of general applicability, and may be relied upon by anyone.[28] Ruling 1974–29 presents a clear legal issue, depends upon no shifting factual circumstances, and provides for no further administrative inquiry.[29] It is the kind of agency action traditionally subject to judicial review, see *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689 (1971) (cited

24.  120 Cong.Rec. 5459 (1974).

25.  FEAA Conf.Rep. No. 93–788, 93rd Cong., 2d Sess., [1974] U.S.Code Cong. & Admin.News, pp. 2972, 2977.

26.  I am not unmindful of the findings of fact and conclusions of law reached by the district judge in *Grace Petroleum Corp. v. Department of Energy,* 456 F.Supp. 945 (W.D.Okl.1978). I would not follow *Grace Petroleum,* however, because there the court assumed the ruling was

interpretative and gave inadequate consideration to the substantial impact of Ruling 1974– 29, a consideration Congress clearly intended, as indicated by section 7(i) of the FEAA.

27.  10 C.F.R. § 205.85(c).

28.  10 C.F.R. § 205.150.

29.  10 C.F.R. § 205.154.

in *Atlantic Richfield Co. v. FEA, supra,* 556 F.2d at 553 n.27), and such rulings have been reviewed by this court in the past. *See, e. g., Southern Union Production Co. v. FEA,* 569 F.2d 1147 (Em.App.1978).

I would affirm the judgment of the district court.